# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID V. RAUTERKUS and**<br>**MARIA RAUTERKUS,**<br>**Plaintiffs,** | ) ) ) ) | **C.A. No. 1:19-CV-240** |
| **v.** | ) ) | **District Judge Susan Paradise Baxter** |
| **UNITED STATES OF AMERICA, by and**<br>**through SONNY PERDUE, in his official**<br>**capacity as Secretary of the Department of**<br>**Agriculture; NATURAL RESOURCES**<br>**CONSERVATION SERVICE; and**<br>**DENISE COLEMAN, in her official**<br>**capacity as State Conservationist (for the**<br>**Commonwealth of Pennsylvania) with the**<br>**Natural Resources Conservation Service,**<br>**Defendants.** | ) ) ) ) ) ) ) ) ) ) ) | **Re: Motion for Preliminary injunction** |

## MEMORANDUM OPINION

## WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.     Procedural History

Pending before this Court is Plaintiffs' motion for preliminary injunction. ECF No. 6.

Plaintiffs David and Maria Rauterkus, owners of real property, initiated this civil action

by filing a complaint for declaratory and injunctive relief. ECF No. 1. As Defendants to this

action, Plaintiffs name the United States of America by and through Sonny Perdue, in his official

capacity as the Secretary of the Department of Agriculture; the Natural Resources Conservation

Service ("NRCS"); and Denise Coleman in his official capacity as State Conservationist with the

NRCS.[1]

---

[1] The NRCS is an agency of the United States within the Department of Agriculture.

This case arises out of a voluntary easement executed between the Rauterkuses and the United States pursuant to the federal Wetland Reserve Program. After the Easement was signed, differences arose between the parties as to the type and scope of the conservation activities that were to occur on the property. Plaintiffs raise four separate legal claims[2]: Counts I and II arise out of § 706 of the Administrative Procedures Act, Count III arises out of the Quiet Title Act, 28 U.S.C. § 2409a, and Count IV is a claim of anticipatory trespass.[3]

The complaint, along with a motion for temporary restraining order/preliminary injunction, was filed on August 23, 2019. Construction relative to the restoration and management activities provided for under the Easement was scheduled to begin on August 26, 2019. Because the undersigned was unavailable, the motion for temporary restraining order was assigned to Judge Marilyn Horan who granted the temporary restraining order as she concluded that "Plaintiffs would suffer irreparable harm, loss and injury" if "the construction on the property is permitted to commence." ECF No. 16. Judge Horan then scheduled an evidentiary hearing for September 3, 2019. *Id.* The parties requested an extension of time to prepare for the evidentiary hearing and that request was granted. By Consent of the parties, the undersigned issued an extension of the temporary restraining order until November 1, 2019. *See* ECF No. 31.

---

[2] Although not specifically pled, the complaint, as well as Plaintiffs' briefing and oral argument, reflects an undercurrent of fraudulent inducement. Any action sounding in fraud must be pled with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 9(b) (providing that, with respect to "allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). Here, no such action is pled.

[3] As part of the requested relief, Plaintiffs seek to have themselves declared as the rightful record owners of the land and to quiet title in the land "by finding that the interest of the United States under the Easement was unlawfully created." ECF No. 1, page 8.

Plaintiffs' motion for preliminary injunction seeks to have this Court issue a preliminary injunction "with regard to all restoration, protection, enhancement, maintenance, and management actions and activities set to commence on the property subject to the Warranty Easement Deed in Perpetuity, Wetland Reserve Program Easement No. 662D3711447. This preliminary injunction shall remain in place until a final decision has been reached with regard to Plaintiffs' underlying request for judicial review." ECF No. 8, page 3.

No Answer has been filed by the Defendants and the Administrative Record is not before this Court at this early stage of the proceedings.


## II.     Standard of Review and the Evidentiary Hearing

A preliminary injunction is "an extraordinary remedy granted only in limited circumstances." *Issa v. Sch. District of Lancaster*, 847 F.3d 121, 131 (3d Cir. Jan.30, 2017) *citing Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. Aug. 26, 2014). There are four factors a court must consider when evaluating a motion for preliminary injunctive relief:

1) Has the moving party established a reasonable likelihood of success on the merits (which need not be more likely than not);

2) Is the movant more likely than not to suffer irreparable harm in the absence of preliminary relief;

3) Does the balance of equities tip in its favor; and

4) is an injunction in the public interest?

*Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. Apr. 22, 2019) *citing Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. Jun. 26, 2017). After the movant meets the first two

"gateway factors," the court then determines whether all four factors, taken together, balance in favor of granting the relief sought. *Id.*

With this standard of review in mind, having now considered the testimony of the witnesses and the evidence admitted at the evidentiary hearing held on November 1, 2019, at which Plaintiff David Rauterkus and Jeff Werner, Assistant State Conservationist at NRCS testified, the Court makes Findings of Fact and Conclusions of Law denying the motion for preliminary injunction. *See* Federal Rule of Civil Procedure 52.

## III.    Findings of Fact

*The Property and the Landowners*

1. David and Maria Rauterkus are the owners of approximately eighty (80) acres of real property at 3579 Fries Road, Espyville, in Crawford County, Pennsylvania.

2. David and Maria Rauterkus have owned the property since 1991 and have lived on the property since 2000.

3. Mr. Rauterkus explained that Mrs. Rauterkus was unable to be present at the preliminary hearing due to extreme fatigue from oral chemotherapy. Mrs. Rauterkus survived two bouts with breast cancer previously. In early spring of this year, Mrs. Rauterkus was diagnosed with adenocarcinoma and is currently treating. Mr. Rauterkus expressed the importance that the land issue resolves in his favor for his own sake, as well as for an aspect of his wife's healing. ECF No. 35, pages 17-18.

4. At the time of the purchase of the property in 1991, about forty acres were fallow farmland and the other forty acres were forest. At that time, the land had not been

farmed in over ten years. After the Rauterkuses took ownership of the property, the land was farmed for about eight years.

5. During their ownership of the property, the Rauterkuses participated in two government programs to convert portions of the farmland into wetlands. This included the Partners program with U.S. Fish and Wildlife Service, as well as the Conservation Reserve Enhancement Program. *See* Plaintiffs' Exhibit 11.

6. On July 22, 2010, David Rauterkus signed an Application form with the Natural Resources Conservation Service to participate in the Wildlife Habitat Incentives Program and the Wetland Reserve Program. Plaintiffs' Exhibit 1.

*Events Leading up to the Signing of the Easement Deed*

7. By letter from Jody Lasko, District Conservationist of the NRCS, dated December 13, 2012, the Rauterkuses were informed: "This letter is to explain your restoration options with respect to the Wetland Reserve Program (WRP). At this time this is my understanding of what NRCS has determined will meet the Program rules and procedures and address your management goals…" Plaintiffs' Exhibit 2.

8. The December 13, 2012 letter detailed the project goals and ended with the admonition that "WRP policies dictate that you will **not** be able to modify these projects **in any way** without NRCS written permission. Plaintiffs' Exhibit 2 (emphasis in original).

9. Between the time the Rauterkuses applied for the WRP and the time the Easement Deed was signed and recorded, multiple government officials had multiple contacts with the Rauterkuses including multiple site visits to the property.

10. Before signing the deed, Mr. Rauterkus expressed concerns that the written restoration plan was not part of the closing document. Mr. Rauterkus was told that the NRCS did not produce restoration plans prior to the closing, but that the plan would be developed after the deed was signed and that Mr. Rauterkus would "be able to participate in the development of that plan and the management plan." ECF No. 35, pages 59-60.

11. Mr. Rauterkus questioned why an addendum entitled "Exhibit D - Water Uses and Water Rights"[4] was not part of the closing documents and he was told that the agency "didn't do Exhibit D's." *Id.* at pages 64-67.

12. Because he was concerned with being able to utilize water on his property, Mr. Rauterkus was told that it would be "taken care of through a compatible use agreement." *Id.*

13. Later, Mr. Rauterkus was told that compatible use agreements were only made after restoration work was completed. *Id.* at page 69.

14. Mr. Rauterkus explained that he felt pressure to sign the Easement Deed. Mr. Rauterkus believed that if he and his wife decided not to sign the Easement Deed, they would be responsible for all costs the agency had expended in preparation for restoration work on his property. Mr. Rauterkus believed the agency had spent in excess of $50,000 for this preparation work. *Id.* at page 70.

15. Mr. Rauterkus read the Easement Deed multiple times before signing it. *Id.* at page 116.

---

[4] The addendum has three sections entitled: "Water Uses and Water Rights Reserved to the Grantor/Landowner"; "Encumbered Water Uses and Water Rights"; and "Protection of Encumbered Water Rights." Each section provides multiple places with instructions that water uses or water rights are to be listed and described within the document. *See* ECF No. 6-2.

*The Easement Deed*

16. Around August 28, 2013, David and Maria Rauterkus signed the Warranty Easement Deed in Perpetuity. Plaintiffs' Exhibit 5. The Rauterkuses granted the Natural Resources Conservation Service of the U.S. Department of Agriculture an easement, the purpose of which was "to restore, protect, manage, maintain, and enhance the functional values of wetlands and other lands, and for the conservation of natural values including fish and wildlife and their habitat, water quality improvement, flood water retention, groundwater recharge, open space, aesthetic values, and environmental education." The Easement explains that "It is the intent of NRCS to give the Landowner the opportunity to participate in the restoration and management activities on the easement area. By signing this deed, the Landowner agrees to the restoration of the Easement Area and grants the right to carry out such restoration to the United States." *Id.*

17. The Deed reserves "… to the landowner only those rights, titles and interests expressly enumerated in Part Two, it is the contention of the landowner to convey and relinquish any and all other property rights not so reserved." *Id.*

18. In Part Two, the Easement Deed makes several Reservations to the Landowner, including Title, Quiet Enjoyment, Control of Access, Recreational Uses, Subsurface Resources and Water Uses and Water Rights. *Id.*

19. The Landowner reserves Subsurface Resources only to the extent that the terms and conditions are listed in EXHIBIT C and appended to and made a part of the Easement Deed. There is no EXHIBIT C attached to the Easement Deed recorded in the Crawford County Recorder of Deeds. *Id.*

20. The Landowner also reserves:

"Water uses and water rights. The right to water uses and water rights identified as reserved to the Landowner in EXHIBIT D which is appended to and made a part of this easement deed, if applicable."

*Id.* There is no Exhibit D attached to the Easement Deed recorded in the Crawford County Recorder of Deeds.

21. The Easement Deed provides for "Compatible Uses by the Landowner":

"The United States may authorize, in writing and subject to such terms and conditions the NRCS may prescribe at its sole discretion, the use of the easement area for compatible economic uses, including, but not limited to, managed timber harvest, periodic haying, or grazing. … Compatible use authorizations will only be made if, upon a determination by NRCS in the exercise of its sole discretion and rights, that the proposed use is consistent with the long-term protection and enhancement of the wetland and other natural values of the easement area. The NRCS shall prescribe the amount, method, timing, intensity, and duration of the compatible use."

*Id.*

22. The Easement Deed also contains a clause stipulating that ambiguities shall be construed in favor of the United States: "Any ambiguity in this easement deed shall be construed in favor of the United States to effect the wetlands and conservation purposes for which this easement deed is being acquired." *Id.*

23. The Rauterkuses received $140,763.00 in exchange for the easement and the Easement Deed is recorded at the Crawford County Recorder of Deeds. *Id.*

*Restoration Planning After the Signing of the Easement Deed*

24. Mr. Rauterkus believed that he would be involved in the preparation of the restoration plan and the drafting of any compatible use agreements. ECF No. 35, pages 71-72.

25. About a dozen people from NRCS were involved in working on the Plan for the Rauterkus property. *Id.* at pages 144, 154-55.

26. In May of 2014, Plaintiffs were presented with a Conservation Plan by the NRCS. The document, signed by the Rauterkuses and Habitat Biologist Richard Voytko, indicates that the "producer" (undefined) has four overall goals or areas of emphasis: "1) waterfowl habitat; 2) woodcock and early successional habitat; 3) wildlife diversity; and, 4) healthy forest." The document also warns: "As part of implementation of his project, it is the landowner's responsibility to conduct ongoing operation and maintenance activities that are compatible with the Long-Term Management Plan that will be developed by NRCS in consultation with landowner." Plaintiffs' Exhibit 7.

27. Related to the Conservation Plan was the Conservation Program Contract which was signed by Mr. Rauterkus in May 2014 (but unsigned by the NRCS) and indicates that Rauterkus would be paid $73,652.00 to implement and maintain specific conservation practices. Plaintiffs' Exhibit 8.

28. Sometime in the late spring or early summer of 2014, Mr. Rauterkus met with Robert Klasen for the first time at the property. At that time, Mr. Klasen told Mr. Rauterkus that Pond C would be drained of three feet of water. Mr. Rauterkus was "very distraught" by this information as he viewed the partial draining as reducing "the jewel of his farm" to "a lump of coal." After this visit, Mr. Rauterkus left a voicemail message for Jeff Werner of the NRCS. ECF No. 35, page 80.

29. On July 16, 2014, Jeff Werner emailed Mr. Rauterkus and advised of the next steps in the process:

"Since the survey of your property was completed, we have been working on development of alternatives that will bring all structures up to current standards. These alternatives will be developed to the point where we have Plan Views and rough cost estimates. Once those are developed, our very next step will be meeting with you to evaluate and come to a common ground as far as what we are able to do and what is going to be manageable for you. ..."

Plaintiffs' Exhibit 9.

30. A couple of weeks before April 1, 2015, Mr. Rauterkus received a detailed Wetland Restoration Plan. Mr. Rauterkus went through the Plan and made written notes and suggestions and presented those to Robert Klasen, who signed and dated the document on April 1, 2015. Plaintiffs' Exhibit 10.

31. Mr. Klasen told Mr. Rauterkus that he would take his suggestions and "evaluate them and determine whether or not there could be adjustments in the restoration plan." ECF No. 35, page 84.

32. On August 19, 2016, David and Maria Rauterkus drafted a letter to Denise Coleman after Mr. Rauterkus became frustrated with Mr. Klasen's reluctance to include his suggestions in the Restoration Plan. This letter lays out the frustrations of the Rauterkuses and provides multiple suggestions to remedy the situation. Plaintiffs' Exhibit 11.

33. By return letter from Denise Coleman dated October 7, 2016, the Rauterkuses were advised:

The Natural Resources Conservation Service has completed a multi-disciplinary review of this project and the issues that you raised in your August 19, 2016 letter. We have reviewed the engineering, the biological, and the program components of this project. ...

This concludes our multi-disciplinary analysis of the project and your requests. While it is the intent of NRCS to work with the landowner on

restoration designs, the ultimate decision is that of the United States, as stated in the WRP Warranty Easement Deed,

> It is the intent of NRCS to give the Landowner the opportunity to participate in the restoration and management activities on the easement area. By signing this deed, the Landowner agrees to the restoration of the Easement Area and grants the right to carry out such restoration to the United States.

> Restoration of these wetlands must be in accordance with our FOTG standards. NRCS cannot compromise the integrity of the design or restoration work. As a landowner, you have relinquished all rights to the United States, including those related to restoration of the easement lands. This letter constitutes a final determination. …

Plaintiffs' Exhibit 12.

34. By letter dated February 28, 2017, the Rauterkuses were informed that the restoration project on their land would be completed by NRCS contractors by September 2017. Plaintiffs' Exhibit 13.

35. The Government's estimate for the cost of the restoration project is over $180,000.00. ECF No. 35, page 102.


*Appeals through Administrative Process*

36. The Rauterkuses appealed Denise Coleman's decision of October 7, 2016 to the National Appeals Division ("NAD"). ECF No. 28, page 8.

37. The NAD Administrative Judge made factual findings which included noting that between June 25, 2014 and August 11, 2016, the NRCS had approximately eleven contacts (phone conversations, in-person meetings, and letters) with the Rauterkuses about the planned restoration and management of the WRP easement. *Id.* at page 9. The appeal was denied.

38. The Rauterkuses appealed that decision to the NRCS Director who upheld the determinations of the NAD. *Id.*

*Alterations to the Property*

39. Construction and restoration work on the Rauterkus property was scheduled to begin in late August 2019 and was halted by Court Order of August 26, 2019.

40. If Defendants are permitted to begin the restoration project, Mr. Rauterkus believes that it will be "physically impossible to return the land to what [the Rauterkuses] have now." ECF No. 35, page 100. The layers of silt, clay and topsoil could not be returned to their present state. *Id.* at page 101.

41. Mr. Rauterkus believes the construction would "absolutely" decrease the number of waterfowl visiting the property, although he acknowledged that he is not an expert in wildlife. *Id.* at pages 103-04.

42. Mr. Rauterkus testified that the construction project could have a negative influence on his personal health and that of his wife: "Having them on my land and having them force this restoration plan on me would be extremely stressful and damaging, not only emotionally, but in a sense physically to the two of us, in terms of our health and our emotion ability to continue to own this piece of property." *Id.* at pages 101-02.

43. Mr. Rauterkus testified "… if they come in and put the restoration plan in effect, and there wouldn't be any amount of money that they could give me that would make me feel comfortable with trying to manage it. And I've said this to friends, and Maria and

I would just try to sell the place. We'd be – we'd be gone. It would just ruin it for us, and I just – I couldn't tolerate it." *Id*. at page 105.

44. The government believes their proposal will provide for the conservation of the wetlands on the property.

## IV.    Conclusions of Law

*Standard of Review*

1. Preliminary injunctions are "extraordinary remed[ies] granted in limited circumstances." *Razor Tech., LLC v. Hendrickson*, 2018 WL 2063844, at *8 (E.D. Pa. May 3, 2018). *See also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. May 24, 2004).

2. The four-factor preliminary injunction standard requires that the moving party first to demonstrate a reasonable likelihood of success on the merits and that it would likely suffer irreparable harm absent the award of an injunction. *ADP, LLC v. Rafferty*, 923 F.3d 113, 119-20 (3d Cir. Sept. 6, 2019) *citing Reilly*, 858 F.3d at 179.

3. If the movant makes that threshold showing, the court then must balance those two "gateway factors" against the relative hardship an injunction would inflict on the parties and the public interest. *Id.*

4. The showing of irreparable harm will be "insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a 'clear showing of immediate irreparable harm.'" *Washington v. Superintendent Gilmore*, 2019 WL

2610765, at *6 (W.D. Pa. Jun. 29, 2019) *quoting Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. Oct. 13, 1992).

5. When ruling on a motion for a preliminary injunction, "a court both finds facts and determines the law. *See* Fed.R.Civ.P. 52(a)(1) & (2). In its fact-finding capacity, at an evidentiary hearing, a court may make credibility determinations as to the witnesses' testimony and the evidence presented during the hearing. *See, e.g., Hudson v. Global Resources Holdings, Inc. v. Hill*, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007) ("A court considering whether to grant a preliminary injunction may assess the credibility of witnesses testifying before it at a preliminary injunction hearing and based its decisions on credibility determination.")." *Berger v. Weinstein*, 2008 WL at *4 (E.D. Pa. July 24, 2008).

6. Plaintiffs seek a preliminary injunction. Accordingly, it is Plaintiffs' burden to prove a likelihood of success on their claims and that they will suffer irreparable injury if a preliminary injunction is not granted.

*Quiet Title Act Claim*

7. "Under the Quiet Title Act of 1972, the United States, subject to certain exceptions, has waived its sovereign immunity and has permitted plaintiffs to name it as a party defendant in civil actions to adjudicate title disputes involving real property in which the United States claims an interest." *Larson v. United States*, 2014 WL 12539647, at * 6 (D.Neb. Jul. 28, 2014) *quoting Block v. North Dakota*, 461 U.S. 273, 275-76 (1983).

8. The Quiet Title Act, 28 U.S.C. § 2409a, provides a limited waiver of sovereign immunity for actions to quiet title against the United States: "The United States may be named as a party defendant in a civil action under this section to adjudicate a dispute title to real property in which the United States claims an interest, other than a security interest or water rights." *Id.* at § 2409a(a).

9. Because the Quiet Title Act represents a limited waiver of the sovereign immunity of the United States, the Act "must be strictly construed in favor of the United States." *Porter v. Samuel*, 889 F.Supp. 213, 300 (D.V.I. Apr. 19, 1995) *citing Shultz v. Department of Army*, 886 F.2d 1157, 1159 (9th Cir. Sept. 28, 1989). *See also Fulcher v. United States*, 696 F.2d 1073, 1076 (4th Cir. Dec. 22, 1982).

10. For a court to have jurisdiction under the QTA, two prerequisites must be met: "(1) the United States must claim an interest in the property at issue; and (2) there must be a disputed title to real property." Leisnoi, Inc. v. United States, 170 F.3d 1188, 1191 (9th Cir. Mar. 19, 1999).

11. Despite the waiver of sovereign immunity for civil damages, the QTA explicitly provides that "no preliminary injunction shall issue in any action brought under this section." *Id.* at § 2409a(c). Accordingly, because the statute itself explicitly forbids it, Plaintiffs' legal claim arising under the QTA cannot provide the basis upon which a preliminary injunction is granted.

*Administrative Procedure Act Claims*

12. Next, Plaintiffs raise two legal claims under the APA, 5 U.S.C. § 706(2)(A) and (D).

13. It is Plaintiffs' position that Defendants violated the APA because they "failed to follow the proper procedure" and/or their "actions were arbitrary, capricious, [or] an abuse of discretion":

> "(i) by not providing an agreeable preliminary WRPO;
>
> (ii) by failing to reach an agreement on a restoration plan;
>
> (iii) by failing to afford Plaintiffs a meaningful opportunity to participate in the development of its proposed conservation for the Land;
>
> (iv) falsely misrepresenting that a preliminary WRPO did not need to be agreed upon prior to entering the Easement; and
>
> (v) falsely misrepresenting that Plaintiffs would have a meaningful opportunity to participate in the development of a conservation for the Land."

ECF No. 1, ¶ 30 (Count I – § 706(2)(D), ¶ 37 (Count II – § 706(2)(A)).

14. In the Administrative Procedure Act, Congress expressly granted a private right of action to enforce federal rights against federal agencies. 5 U.S.C. § 702. The United States "has expressly waived sovereign immunity through the Administrative Procedure Act for any action for nonmonetary relief brought against the United States." *Ramos v. Raritan Valley Habitat for Humanity*, 2019 WL 4316575, at * 5 (D. N.J. Sept. 12, 2019) *citing Peet v. Sidney*, 2019 WL 542939, at * 3 (D. Minn. Jan. 24, 2019).

15. Nonetheless, when other legal claims, such as APA claims, are intertwined with legal claims under the QTA, the QTA provides the exclusive source of the court's jurisdiction. *Block v. North Dakota*, 461 U.S. 273 (1983) (barring APA claims); *United States v. Mottaz*, 476 U.S. 834 (1986) (barring General Allotment Act claim); *Governor of Kansas v. Kempthorne*, 516 F.3d 833, 842 (10th Cir. Jan. 30, 2008) (holding that an APA suit alleging that a governmental decision is arbitrary

and capricious can be "a quiet title action sufficient to invoke the Quiet Title Act."); *Sawtooth Mountain Ranch LLC v. United States Forest Service*, 2019 WL 2477608, at *6 (D.Idaho Jun. 13, 2019) ("If the Court finds the QTA applies, *Block* prohibits a party from seeking to subvert the limitations in the QTA by basing preliminary injunctive relief on the APA …"); *Northern New Mexicans Protecting Land Water and Rights v. United States*, 161 F.Supp.3d 1020, 1052 (D.N.M. Jan.30, 2016) ("The Quiet Title Act provides the exclusive means for litigating title disputes against the United States."); *City of Tombstone v. United States*, 2012 WL 12842257, at *3 (D.Ariz. May 14, 2012) (denying plaintiff's attempt "to subvert the limitations in the QTA by basing preliminary injunctive relief on the APA and Tenth Amendment."). This Court lacks jurisdiction over the APA claims.

16. Although Plaintiffs rely on *Duhring Res. Co. v. United States Forest Service*, 2009 WL 586429, at *7 (W.D. Pa. Mar. 6, 2009) for the proposition that the Court actually does have jurisdiction to issue a preliminary injunction here, Plaintiffs' reliance is misplaced. In *Duhring*, Judge Lancaster held that the the QTA was not the exclusive source of the court's jurisdiction where "the true nature of Duhring's dispute with the USFS is not regarding ownership of an easement, but rather, the conditions under which Duhring may develop its [oil, gas and mineral] rights." The holding is *Duhring* is inapposite here as Plaintiffs seek to have themselves declared the rightful record owners of the land and to quiet title in the land "by finding that the interest of the United States under the Easement was unlawfully created." ECF No. 1, page 8. Moreover, the posture of the *Duhring* case was a motion to dismiss, not a preliminary injunction.

17. Alternatively, even if Plaintiffs' APA claims were not inextricably intertwined with the QTA, Plaintiffs have not satisfied their burden to demonstrate that there is a likelihood of success on the merits of these claims as the law does not require that the Rauterkuses **consent** to the terms of the conservation plan chosen by the agency, only that they be permitted to participate in the planning. The evidence shows that the Rauterkuses have participated in the process. It is the ultimate plan to which they object, and they do not have a right of refusal under the express terms of the written Easement Deed. *Big Meadows Grazing Assoc'n v. United States*, 344 F.3d 940 (9th Cir. Sept. 15, 2003).

*Anticipatory Trespass Claim*

18. Plaintiffs' trespass claim is based on Defendants' anticipated and intentional "elevation of the groundwater under and around Plaintiffs' property, damaging Plaintiffs' property and preventing Plaintiffs from use and enjoyment" of it. ECF No. 1, ¶ 47.

19. Trespass is a strict liability tort, "both exceptionally simple and exceptionally rigorous." *Boring v. Google, Inc.*, 362 Fed. App'x 273, 281 (3d Cir. Jan. 28, 2010) *quoting Prosser on Torts* at 63 (West, 4th ed.1971). Under Pennsylvania law, trespass is defined as an "unprivileged, intentional intrusion upon land in possession of another." *Id. citing Graham Oil Co. v. BP Oil Co.*, 885 F.Supp. 716, 725 (W.D. Pa. Sept. 1, 1994). One "who intentionally enters land in the possession of another is subject to liability to the possessor for a trespass, although his presence on the land causes no harm to the land, its possessor, or to any thing or

person in whose security the possessor has a legally protected interest." *Id.* at 281, *quoting* Restatement (Second) of Torts § 163.

20. As discussed above, when other legal claims are intertwined with legal claims under the QTA, the QTA provides the exclusive source of the court's jurisdiction and the QTA's waiver of sovereign immunity must be construed in favor of the United States. Here, Plaintiffs' claim of trespass involves a dispute between the Rauterkuses and the United States over the title to real property and so is subject to the requirements of the QTA.

*Irreparable Injury*

21. Although this Court has no jurisdiction over the APA and anticipatory trespass claims and preliminary injunctive relief under the QTA is expressly forbidden, this Court will examine the irreparable injury factor to reflect a complete review of the preliminary injunction requirements.

22. The evaluation of a request for preliminary injunctive relief is a balancing test. *Fulton,* 922 F.3d at 152. "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the [movant's] claim on the merits can be while still supporting some preliminary relief." *Reilly*, 858 F.3d at 179, *quoting Hoosier Energy Rural Elec. Corp., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. Sept. 17, 2009).

23. The irreparable harm prong "requires courts to determine whether it is 'more likely than not [the movant will] suffer irreparable harm in the absence of preliminary relief.'" *Reilly*, 858 F.3d at 179.

24. Irreparable harm is "of a peculiar nature" for which "compensation in money alone cannot atone." *Id. quoting Opticians Ass'n of Am. v. Ind. Opticians of Am.,* 920 F.2d 187, 195 (3d Cir. Dec. 27, 1990). The injury "cannot be purely economic," but "must pose a potential harm which cannot be redressed by a legal or equitable remedy following trial." *Razor Technology*, 2018 WL 2063844, at *11 (internal citations omitted). *See also Reilly*, 858 F.3d at n.4 ("the availability of money damages for an injury typically will preclude a finding of irreparable harm").

25. To demonstrate irreparable harm, the moving party must show "immediate irreparable injury, or a presently existing actual threat." *Vento v. Certain Underwriters at Lloyds*, 2019 WL 2396554, at * 2 (D.V.I. Jun. 6, 2019) *quoting Acierno v. New Castle Cty.,* 40 F.3d 645, 655 (3d Cir. Nov. 10, 1994). The harm must also be "imminent." *Id. quoting Punnett v. Carter*, 621 F.2d 578, 586 (3d Cir. May 13, 1980).

26. The Supreme Court has established that the movants must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction. *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 21 (2008).

27. Here, the Rauterkuses have not established that irreparable harm to their property is likely. Mr. Rauterkus believes that there will be fewer ducks on his property, but he has acknowledged that he is not an expert in these matters. Mr. Rauterkus believes that the soil will be disrupted and that the layers of silt, clay and topsoil cannot be returned to their present state. Again, Mr. Rauterkus is not an expert in these matters.

28. Based on the evidence before it, this Court cannot say that the NRCS, which has the same overall goal as the Rauterkuses—conservation and preservation of wetlands, as well as the technical and scientific expertise with its experts—will not conserve the land appropriately.

*Other Factors*

29. Although Plaintiffs have not met their burden to demonstrate either the first or second "gateway factors," this Court will examine the other two factors, weighing the relative hardship an injunction would inflict on the parties or the public interest.

30. When the government is the party opposing the motion for preliminary injunctive relief, these two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

31. Here, the Department of Agriculture purchased the Easement and since that purchase in August 2013, has expended time and money preparing the restoration plan. Granting an injunction against use of the Easement is a hardship on the NCRS and on the Department.

32. The public interest lies with the government as the grant of an injunction would delay it from using its Easement generally and would delay the preservation and conservation of the wetland. Moreover, the NRCS has provided a Declaration that further delay will result in additional expenses in the amount of $16,065.31 for reprocurement of the contract and contractor overhead. *See* ECF No. 28-5. Declaration of Danny Gonzales Mandell, Contracting Officer, United States Department of Agriculture.

33. A balancing of the four factors weighs against granting preliminary injunctive relief to Plaintiffs.

An appropriate Order will follow.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID V. RAUTERKUS and | ) | |
| MARIA RAUTERKUS, | ) | C.A.No. 1:19-cv-240 |
|     Plaintiffs | ) | |
| | ) | |
| vs. | ) | District Judge Baxter |
| | ) | |
| UNITED STATES OF AMERICA, et al, | ) | |
|     Defendants. | ) | |

## O R D E R

AND NOW, this 14th day of November, 2019;

IT IS HEREBY ORDERED that Plaintiffs' motion for preliminary injunction [ECF No. 6] is denied.


SUSAN PARADISE BAXTER
United States District Judge

1